UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Robert Bernard**<br>          **Plaintiff**<br>**vs**<br>**Jennifer Webb-McRae, Howard Shapiro, Richard Necelis, and Ronald Cuff individually and in their official capacities, and Cumberland County, a New Jersey municipal corporation,**<br><br>          **Defendants** | **CASE NO: 1:17-cv-07030 RBK AMD**<br><br>**CIVIL ACTION** |

# PLAINTIFF'S BRIEF OPPOSING MOTION FOR SUMMARY JUDGMENT

**STATEMENT OF FACTS**

Plaintiff has been an employee of Defendant Cumberland County ("County" or "the County") since 2002, serving at all relevant times, he served as a Detective in what was first known as the Narcotic Task Force ("NTF") and is now the Organized Crime Bureau ("OCB").

Defendant Jennifer Webb-McRae is the Cumberland County Prosecutor. Defendant Howard Shapiro is First Assistant Prosecutor in the OCCP. Defendant Richard Necelis is Chief of Detectives in the OCCP, and was formerly a Detective in the office. Defendant Ronald Cuff is a Special Agent in the OCCP, but is not a sworn police officer. He was recently promoted to a new position, Chief of Staff.

In or about April 2013, a colleague at the OCB, Lynn Wehling, initiated an internal complaint of sexual harassment and hostile environment at the hands of her superior, Sgt. George Chopek. In connection with an IA investigation into Wehling's complaint, Plaintiff was interviewed by Defendant Necelis, and by Detective Jay Pennypacker. In the course of that interview, Plaintiff corroborated some of Wehling's claims.. Three other officers from the OCB were interviewed by IA in connection with Wehling's claims: Lt. Rosemary Parks, Sgt O'Neill and Detective Raymond Caravagno; on information and belief all three denied any knowledge of her claims. O'Neill and Caravagno were subsequently promoted. Subsequently, Wehling initiated an action against the OCCP and certain individuals for a sexually hostile environment and aider-and-abettor claims. Beginning late in 2015, and continuing to mid-2016, there were a series of events that Plaintiff claims to be interrelated:

- In 2015, the CCPO initiated a disciplinary proceeding against Chopek; in November of 2015, Plaintiff was called as a witness in that proceeding, and testified against Chopek.

- In October 2015, Plaintiff learned that he had had an IA charge of lack of candor sustained against him during a 2012 investigation into something that had happened in 2007.

- In or about February 2016, Defendant Shapiro advised Chopek's attorney that Plaintiff was a "Brady issue", having been sustained for "candor"; and advised him that this should have been disclosed prior to the Chopek proceeding.

- In mid- June, 2016, Wehling settled her civil lawsuit against Defendant Cumberland County for $450,000.00.

- In July 2016, Chopek was promoted to Lieutenant.

- On August 1, 2016 – without notice or warning -- Plaintiff was transferred to the Trial/Grand Jury unit within CCPO.   Many people within the CCPO regard the Trial / Grand Jury unit as a punishment assignment.

**The events of 2007**

In 2007, as well as the years before and after, detectives assigned to the NTF, now known as the OCB, would be directed by Lt. Rosemary Parks to generate transaction records for confidential informant funds and a buy sheet.  There was no written policy or protocol for these forms; it all rested on the verbal instructions of Lt. Parks.  It was then (ca 2007) standard practice within the NTF to pay a Confidential Informant ("CI") a nominal sum, in United States currency, such as $20, for their services in making the controlled buy or supplying information.  The officer disbursing the funds was required to prepare a form to document the expense, and have the CI sign it; the form then called for another officer to "witness" on a line next to the CI's signature, presumably as a witness to the CI signing the form.  However, nowhere on this form is there an indication that the "witness" is acknowledging that he saw the disbursing officer handing the cash to the CI, as Defendant Cuff subsequently spun it in his 2012 report.  Despite the plain format of the form, as Plaintiff understood it *at the time,* the witness' signature did not purport to represent that the witness had observed the payment to the CI, merely that the disbursing officer was swearing to that payment.  These sheets would be held by the detectives for a period of time up to a year, before Lt. Parks would collect the buy sheets to update the in-house books for state auditing, and make reimbursement.  If Lt. Parks noticed that the buy sheet wasn't witnessed, she would have the detective who disbursed the funds to go back and get another detective

who was on the investigation to witness it.  Lt. Parks would then balance the books, and reimburse the detectives for money that they advanced to informants for drug buys.  This was standard operating procedure in the NTF.

.       In that 2007 time period,  Plaintiff was once assigned to work with one Detective Cruz, a Vineland police officer on assignment to the NTF,  in a narcotics investigation that involved  a CI code number 013.   On an occasion later in 2007, Plaintiff  witnessed  a controlled buy disbursement form, after the fact; Plaintiff 's intent was to sign as a witness to Cruz' signature, only.

### *The events of 2012*

Some years later, Cruz was determined to have lied and fabricated evidence in many cases, and CCPO conducted a broad IA investigation of him, including his relationships with this CI and others.  In 2012, an IA "investigation" of this particular set of controlled buys was ostensibly conducted by Defendant Cuff; but Plaintiff was never given any notice of same, nor was he given a target letter. The investigation of Plaintiff was collateral to the broader investigation of Cruz' conduct.   Plaintiff was called by Lt. Parks, and advised to report to Defendant Cuff in IA.  Cuff advised Plaintiff that he was not a target, but only a witness to an investigation regarding Detective Cruz' generation of a disbursement form. The interview was recorded.  Afterwards, Plaintiff was advised by Cuff that the CI, 013, reported that he/she had not received the money reported by Detective Cruz; and that criminal allegations *against the Plaintiff* had been submitted to the Attorney General's Office of Criminal Prosecution,  and then returned to the OCCP to be handled administratively. Cuff acknowledged not giving Plaintiff a target letter, and justified it with a tortured rationalization that if he had given notice, Cruz might have found out, and tried to influence Plaintiff's testimony.   Plaintiff was also told, by Cuff, that he was looking at all CI expense vouchers  from the NTF from 2007. After being interviewed by Cuff, and without knowing that he was a collateral target, Plaintiff heard no more of this subject for

over three (3) years.[1]

*The events of 2015*

Then, in October 2015, at a meeting with Defendant Chief Necelis and Lt. O'Neill, Plaintiff was told that as a result of Cuff bringing his 2012 interview of Plaintiff, and his 2014 report, to Defendant Shapiro's attention, he had determined that he was a "Brady" issue because of his witnessing the buy sheet for Detective Cruz. Lt. O'Neill further advised Plaintiff at this time that Defendant Shapiro wanted to terminate him over this issue, but could not act because of the "45 day rule"[2]. Defendant Necelis advised Plaintiff that Defendant Cuff had recommended discipline as a result of his 2014 investigation of the 2007 transaction, but then-Chief William Johnson "sat on it". Plaintiff requested to review the recorded statement, and Necelis agreed to arrange that.

When Plaintiff met with Defendants Neclis and Cuff the next day to review his statement, Cuff had already cued up the tape to the portion where he acknowledged signing the form after the fact; and over his objection, that was the only part that Cuff played for the Chief. Plaintiff questioned Cuff about his 2012 statement that he was investigating all 2007 CI vouchers, and what the result had been; Cuff told him that he stopped his investigation of the 2007 transactions because "there were too many". Plaintiff responded that if he had completed the investigation, he would have found many instances of forms being witnessed in the same way as he had witnessed Cruz'; and that he would have seen that his own sister-in-law, Lt. Parks – who was *never* outside on investigations– had witnessed some.

At the conclusion of Chopek's hearing, Chopek's lawyer bought up Plaintiff's Brady issue; and then Defendant Shapiro sent County Counsel Baker a lengthy letter about that subject. The end result was that the Chopek disciplinary proceeding came to naught.

---

[1] It should be noted that Defendant Cuff, a civilian, was not authorized under the Attorney General's Guidelines to conduct IA investigations whatsoever, and he was particularly precluded from this one because Lt. Parks, commanding officer of the NTF at all relevant times, is his sister-in-law.

[2] NJSA 40A:14-147.

On August 1, 2016 – just weeks after the Wehling lawsuit was settled, and Chopek was promoted to Lieutenant – Plaintiff was transferred from his longtime assignment in the OCB to Trial Unit/ Grand Jury Function. This is widely regarded as a disciplinary or punitive assignment, with little opportunity for advancement or overtime. The transfer was ordered and/or approved by Defendants Webb-McRae, Shapiro and Necelis. This transfer was sudden and abrupt, and concealed from Plaintiff for a month or so, during which time other detectives being transferred were told of their new assignments, and some even had input in the process.

### Plaintiff has been targeted in other IA investigations since June 2016

In November 2015, Plaintiff – along with Lieutenant O'Neill, Sergeant Chris Rodriguez, Detectives Angel Tellado, Tomasz Kwintiuk, Ryan Breslin and William Serrano- were assigned to assist Detective Jose Torres with the execution of a search warrant in Bridgeton, NJ. The search warrant, which Plaintiff had no role in obtaining, targeted the wrong house. On August 30, 2016 – just one month after being transferred to Grand Jury / Trial – Plaintiff was advised by Defendant Cuff that he was the target of an IA investigation about the execution of this search warrant at the wrong location. To the best of Plaintiff's knowledge, only he and Torres were the subjects of an IA arising from this. Plaintiff was exonerated, as was Torres eventually.

A year later, in August 2017, while being interviewed as a witness in the on-going IA proceeding involving Torres and the Bridgeton search warrant, Defendant Cuff told Plaintiff that he had recently been the target of yet another IA for exposing the identity of a CI during another, separate investigation; and that Cuff had found that accusation unfounded. However, Plaintiff was never timely advised of that IA's existence; and never received the mandatory target letter.

In June 2018, Plaintiff was advised that he was the target of an IA investigation over the mishandling of evidence from an investigation known as *Operation Last Friday.* In October 2018, he was advised that the allegation was deemed to be unfounded.

### The meeting with Shapiro

On April 13, 2017 Defendants Shapiro and Necelis called Plaintiff to a meeting

at which they advised him that in connection with an investigation on which he had worked, defense counsel were being given a "Brady" notice that he had been substantiated on a "candor" issue in October 2014 . During the meeting between the three of them at which this was discussed, Defendant Shapiro denied being the person who had approved the "sustained" finding of a lack of candor arising from the 2007 CI voucher; Plaintiff responded that he was told that it had been Shapiro. Although present when Plaintiff was allegedly told this in 2015, and present again when Shapiro discussed it with Plaintiff in 2017, Necelis did not contradict Plaintiff's statement.

### *Credibility of Defendants*

In or about 2013, the CCPO had to dismiss several drug indictments because new software purchased by the office, for tracking payments to CI, had impossibly confused the identity of the CI . A major IA followed. Defendant Necelis (then a Detective) conducted the IA. However, Necelis testified that Cuff had done so  a statement that Cuff corroborated. Both gave false testimony about this.

On or about October 21, 2015, Plaintiff was advised that he had been sustained on a "Candor" issue, and now had to be disclosed to defense counsel. At that time, his superior, Sgt O'Neill, advised him that the candor finding by Cuff was sustained by Defendant Shapiro. However, on April 13, 2017, when Plaintiff met with Defendants Necelis and Shapiro to discuss a Brady disclosure about him in connection with the Operation Last Friday prosecutions, Shapiro told him that it was Defendant Webb-McRae that had approved Cuff's findings, not him. When Plaintiff told Defendant Shapiro, in front of Defendant Necelis, that O'neill had said it was him, Necelis, Necelis did not contradict this statement.

### POINT I
### THERE ARE MATERIAL QUESTIONS OF FACT IN DISPUTE, AND THESE MUST BE RESOLVED BY A JURY

"Material facts are those 'which could affect the outcome of the proceeding,' and a 'dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable

jury to return a verdict for the non-moving party'.**", Roth v NORFALCO, LLC 651 F. 3d 367, 373 (3d Cir., 2011)** citing to **Lamont v New Jersey, 637 F. 3d 177, 181 (3d Cir., 2011).** See also **Kaucher v County of Bucks, 455 F. 3d 418, 423 (3d.Cir., 2006).**

The issue of the motivation, or intent, of Defendants Webb-MKcRae, Shapiro, Cuff and Necelis is relevant. In **Shellenberger v Summit Bancorp., 318 F 3d 183, at 187-188 (3d.Cir., 2003)** the Court made it very clear that motivation was relevant in a pretext case, once the employer offers evidence of a legitimate business reason for the adverse employment action – which here is put forward as Plaintiff's lack of candor - then the Plaintiff has the burden to show that an intent to discriminate "...played a role in the employer's decision making process and that it had a **determinative** effect on the outcome of that process.", *id at 187*; (emphasis added)**.** Here, the evidence of a retaliatory intent clearly creates questions of fact that must be resolved by a jury: was there a retaliatory intent? if so, was it determinative or a substantial motivating factor? Or perhaps, only an incidental consideration?

It is settled law that the Court "..is not permitted to make factual findings, which remains the province of the jury." **Berckeley Inv. Group, Ltd v Colkitt, 455 F. 3d 195, 201 (3d.Cir., 2006).** In this case now before the Court, there are genuine issues of material fact, especially as to the motivation and intent of the named Defendants. "Treating issues of intent as factual matters for the trier of fact is commonplace.", **Pullman-Standard v Swint, 456 U.S. 273, 288 (1982),** and this honorable Court should allow a jury the chance to do its job.

*a. Was the treatment of Plaintiff prompted by his testimony for Wehling*

"Temporal proximity" can certainly establish a causal link between a protected activity and an adverse employment action, **Young v Hobart West Group, 385 NJ Super. 448 (App.Div., 2005).** However, it is certainly not a requirement to bringing suit or recovering.

Moreover, it is respectfully submitted that "temporal proximity" must be viewed as a relative term; some organizations can undoubtedly act quickly; others act in all matters at a glacial pace, but the speed of their process need not be interpreted as a lack of causal

connection. In the case at bar, we can see that it took over two years for Defendant Cuff to conclude his investigation of Officer Cruz, in which Plaintiff's transgression was a "collateral issue". Similarly, it took well over two years for Detective Wehling's complaint of a sexually hostile environment to reach the point of a departmental disciplinary proceeding. In that context, what is implausible about a process that lasted 8 months from Plaintiff's testimony in support of Wehling, against Chopek; through the tardy disclosure of his Brady issue; through the settlement with Wehling; through the promotion of Chopek; to the abrupt re-assignment of Plaintiff? In this context, consider the guidance in **Romano, supra, at 550:**

> In the present case, the motion judge should not have limited her attention to the proximity between Anderson's original complaint and the firing of plaintiff. We doubt that a sophisticated employer, such as defendant, would immediately retaliate. Rather, a jury may find that after Romano's testimony became more favorable to Anderson, defendant's wounds merely festered until an opportunity to terminate presented itself in the form of knowledge of Romano's marriage to Anderson. Even if he changed his version in September 1991, a jury might find that he had only then gained the strength to come forward with the truth for the first time. We are satisfied that on the facts presented, a reasonable jury could find that Romano was terminated because he honestly supported Anderson's version of the incident or otherwise failed to trivialize its importance.

Here, it is certainly plausible that Shapiro's "discovery" of Plaintiff's "candor issue" in fall 2015, followed by his failure to disclose it prior to the Chopek hearing, coupled with a final –if expensive– resolution of Wehling's claim, set the stage for the CCPO's revenge against Plaintiff for not doing his part to keep Wehling's claims from growing "legs" and becoming viable and plausible. The jury, and not this Court, should decide this question.

### b. Were Defendants' alleged "legitimate reasons" pretextual

It is certainly laudable that the CCPO, under Defendants Webb-McRae and Shapiro, have been leaders in observing Brady obligations as to testifying officers. However, their commitment to this ideal has limits – consider Defendant Webb-McRae's testimony at Ex ,

52-4 to 53-10:

> **Q.** Well, taking up your answer there that you regarded the Cruz dishonesty as warranting the dismissal of open cases, why didn't it warrant telling people who might be sitting in jail because of his testimony?.
> **A.** Well, in the Cruz matter it was public – it became public at some point what had occurred, and as a result of that we did have several cases where people– I believe the Pettaway case was one of them – where they questioned the actions as a result of that information.
> **Q.** Well, whether it becomes public or not, that has nothing to do with your ethical duty, does it?
> **A.** No, it doesn't have anything to do with that.
> **Q.** So once you determined that Officer Gami Cruz was not a truthful witness, at least at times, did you not have an obligation to go back to everybody who he ever testified against for your office and tell them what you had learned about him?
> **A.** Well, like I said, it was a very public matter, so we knew people were aware of it. And we actually did look at files, like a random pulling of files to look at other cases, and we also went back and looked at old IA files.
> **Q.** Well, its not like you published a public notice that said if you were ever convicted in a case where Gami Cruz was a witness, come and see us, right? There was a newspaper article that some people might have seen.
> **A.** It was a very public affair.

She is quite willing to let all those who were convicted or, more likely, took pleas, because of the strength of Officer Cruz' now-suspect evidence, remain incarcerated until and unless they, or a concerned relative or friend, stumbles across an old newspaper account of Cruz' perjury.

Moreover, the entire basis for the treatment of Plaintiff must be seen as suspect. First of all, contrary to what he was told by Defendant Necelis 2015, Defendant Cuff did not recommend discipline in his 2014 report, nor did he find that Plaintiff "lacked candor". Rather, Defendant Cuff was fulsome in his praise for Plaintiff's honesty and forthright testimony, and never expressed any doubts that Plaintiff's explanation was truthful. Secondly, looking at the document in question, how was Plaintiff – in 2007 – supposed to know that he should only sign as witness on the document (Pltf Exhibit B, as well as the first page of Defendant Exhibit 7) if he had observed the transaction? The document is *not* self-

explanatory; and no one has pointed to evidence to contradict Plaintiff's claim that there was no training on how to complete these documents in 2007 or earlier. Any conclusion based on the Cuff report that Plaintiff "lacked candor" is the product of wishful thinking.

Furthermore, the Cuff report conveniently makes no mention of the April 2012 incident which involved CI 013, Defendant Cuff, Lt. Oneill, Plaintiff and ATF Agent Kalita. That event either proves Defendant Cuff to be 'lacking in candor' *or* that CI 013 was a storyteller, or both. ( However that event is viewed, it casts doubt on the accuracy of Lt. O'Neill's testimony). While it is true that it had nothing to do with Cruz, it had everything to do with the issues surrounding Plaintiff. The jury should be able to hear all of this, and determine if the CCPO's concerns about Plaintiff's veracity were genuine or a pretext.

## POINT II
## PLAINTIFF'S TESTIMONY WAS PROTECTED CONDUCT UNDER LAD AND TITLE VII

Plaintiff truthfully testified in the IA investigation into Detective Wehling's complaint of a sexually hostile working environment; and again, at the Chopek disciplinary hearing – which sought to punish him for his conduct in creating a sexually hostile environment for Plaintiff's colleague Wehling – and in so doing, earned the resentment of many people in the CCPO. This is demonstrated not only by the retaliation directed at Plaintiff, but also the reward and recognition given to Chopek – a promotion to Lieutenant. This was clearly protected activity on Plaintiff's part:

> Taken as a whole, therefore, the LAD operates not only to fight discrimination wherever it is found, but to protect those who assist in rooting it out. Although the LAD has been part of our legal landscape for decades, discrimination in the workplace has not been eliminated and individuals claiming to be its victims still turn to our courts seeking relief. Their often novel arguments require our utmost care and attention in order that we may be steadfast in our efforts to effectuate the Legislature's goal of workplace equality.
> **Quinlan v Curtiss-Wright Corp., 204 NJ 239 (2010)**

Defendant correctly asserts that federal Title VII analysis and NJ LAD analysis, for the

most part, are synonymous. In **Thompson v North American Stainless, 131 S. Ct. 863, 868 (2011)** the Court held "... Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct".   This is very consistent with New Jersey's ruling in *Quinlan, supra.*  See also **Romano v Brown & Williamson Tobacco, 284 NJ Super 543, 548- 549 (App.Div., 1995)**

> To establish a prima facie case of retaliation under LAD, Romano had to show that 1) he was engaged in a protected activity known to the defendant; 2) he was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two. ... Romano was engaged in a protected activity by assisting Anderson as a witness in her lawsuit for sexual harassment. Further, it is clear that he was subject to an adverse employment decision as he was fired. Thus, the trial court properly found that Romano had met the first two prongs of the prima facie test.

In the case now before the Court, Plaintiff twice gave testimony to corroborate that Ms. Wehling was subjected to a sexually hostile environment.  To find that his conduct was not protected would be to undermine the fundamental goals and purposes of the LAD.

### POINT III
### PLAINTIFF SUFFERED ADVERSE EMPLOYMENT ACTIONS

Plaintiff has alleged a multitude of adverse employment actions: a transfer to a position with less overtime opportunity and less opportunity for promotion; being the subject of unjustified IA investigations; being denied opportunities, within his current job, to display his abilities; and assignment of tasks not commensurate with his experience and background.  While it is an unreported case and not precedential, **Piniero v New Jersey Division of State Police, A-3494-10 (App.Div., 2012)** gives an excellent summary of what can constitute an 'adverse employment action" in New Jersey:

> Moreover, retaliation "need not be a single discrete action." Green v.

>Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003). Rather, it "can include... many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Ibid. Accord Beasley v. Passaic Cnty., 377 N.J. Super. 585, 609 (App. Div. 2005) ("A pattern of conduct by an employer that adversely affects an employee's terms and conditions of employment can qualify as retaliation under CEPA.").... In considering whether there has been an adverse employment action, relevant factors include "the employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees," as well as "assignment to different or less desirable tasks." Mancini v. Twp. of Teaneck, 349 N.J. Super. 527, 564 (App. Div. 2002) (considering claim of retaliation under the LAD). Accord Donelson, supra, 206 N.J. at 258 (retaliatory acts consisting of "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations—causing the employee to suffer a mental breakdown and rendering him unfit for continued employment"); Maimone v. City of Atl. City, 188 N.J. 221, 236-37 (2006) (transfer from detective position to patrol duty constituted adverse employment action under CEPA; although it resulted in no reduction in rank, it resulted in lower compensation and lost benefits, including lost overtime possibilities and lost undercover car); Nardello, supra, 377 N.J. Super. at 435-36 (denial of firearms instructor training, coerced resignation from SWAT team, denial of work on crime prevention programs, removal from detective bureau with supervisory authority taken away, and assignment of demeaning jobs not commensurate with the plaintiff's rank as lieutenant). See also Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005) (transfer to administrative duty).

Reading this, one might even suspect that Plaintiff's superiors read it in order to get a few new ideas on how to get at Plaintiff. There can be no doubt that he was the target of multiple adverse employment actions.

## Conclusion

On a summary judgment motion, "...the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in its favor.", **Marino v Indus.**

**Crating Co., 358 F. 3d 241, 247 (3d.Cir., 2004).** Here, Plaintiff has produced his own sworn testimony as to what he experienced; Defendants have produced no affidavits to rebut his version of events. They have, admittedly, directed the Court's attention to some deposition testimony that touched on these events, and to some extent, presented a different version. But, if Plaintiff's testimony is accepted as true – and the precedents direct this Court, at this stage, to accept it as true – he has presented a timeline from which a set of rational jurors *could* conclude that his treatment after his Wehling testimony was retaliatory; that that retaliation was attributable to his Wehling testimony; and that he suffered harm and damages as a result. The Court should deny the summary judgment motion, and schedule this case for trial.

Dated: February 7, 2020                                                         George J Cotz 0463